UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

MICHAEL A. SELVAGGIO, JR,
                                                    :
                          Plaintiff,                        AMENDED COMPLAINT

                                                    :
              -v-                                           JURY TRIAL DEMANDED

NEW YORK DAILY NEWS L.P. and          :
NEWSPAPERS and MAIL DELIVERERS              Docket No.: 08 Civ. 6511 (WHP)(HD)
 UNION OF NEW YORK AND VICINITY
                                                    :
                          Defendants.

----------------------------------------------------------x


        Plaintiff, Michael A. Selvaggio, Jr. by his attorney Noah A. Kinigstein, Esq., as per

Federal Rule of Civil Procedure 15, files this First Amended Complaint.


## JURISDICTION


        1.  This Court has jurisdiction of this matter because this proceeding was initiated when a

petition to vacate the arbitrator's decision in the Supreme Court of the State of New York,

County of New York, on June 23, 2008 was originally filed pursuant to Article 75 of the New

York Civil Practice Laws and Rules and was removed thereafter to the United States District

Court for the Southern District of New York on July 22, 2008.  The Plaintiff was served with the

Notice of Removal on July 25, 2008.  The Court has jurisdiction as stated by the defendant Daily

News in paragraph 5 of its Notice of Removal:

5. Based on the foregoing, Plaintiff's suit against the Daily News is a suit for a violation of a contract between an employer and a labor organization representing employees in an industry affecting commerce as defined in the LMRA, 29 U.S.C. §185, of which this Court has original jurisdiction under that section, as well as pursuant to 28 U.S.C. §§1331 and 1337. It is also an action of a civil nature founded on a claim of right arising under the laws of the United States , and therefore may be removed to this court under the provisions of 28 U.S.C. §1441(b) without regard to citizenship of the parties.

In addition this court has supplemental jurisdiction of the New York State law claims pursuant to 28 U.S.C. § 1367.

2.  For purposes of this First Amended Complaint, the Plaintiff has dismissed the defendant the American Arbitration Association, and has added the defendant, the Newspapers and Mail Deliverers Union of New York and Vicinity (hereinafter "NMDU") as a defendant. Finally, The plaintiff has amended the caption to reflect the correct name of the Daily News, Daily News L.P.

**PARTIES**

3. The plaintiff, Michael Selvaggio is an individual and resides at 11 Harding Street Smithtown, New York, 11787.  In or about 1966, Mr. Selvaggio began working for the Daily News as a journeyman/pressman. In 1973 Mr. Selvaggio became a "shape" newspaper/deliveryman. His job was to deliver Daily News newspapers to newsstands around New York City.  In 1985, Mr. Selvaggio became qualified to become a member of the NMDU, and he has been a member ever since.

2

4.  The Daily News, L.P., is, upon information and belief, a limited partnership engaged in interstate commerce within the meaning of section 301 of the Labor Management Relations Act, ("LMRA") 29 U.S.C. § 185 and at all material times has been a party to a collective bargaining agreement with the Newspaper and Mail Deliverers Union of New York and Vicinity ("NMDU"), a labor organization representing employees in an industry affecting commerce, as defined in Section 301 of the LMRA, 29 U.S.C. § 185.  The collective bargaining agreement contains a grievance and arbitration provision and provides for arbitration to be held before a neutral arbitrator selected pursuant to the Labor Arbitration Rules of the American Arbitration Association ("AAA").  The Daily News has a principal place of business at 450 West 33rd Street, New York, NY 10001.  The Daily News publishes a daily newspaper in the City of New York, State of New York.  At all relevant times the collective bargaining contract was in full force and effect and covered Mr. Selvaggio who was at all relevant times a member of the NMDU.

5.  The Newspaper and Mail Deliverers Union of New York and Vicinity ("NMDU") is a labor organization representing employees in an industry affecting commerce, as defined in Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.  The NMDU has a principal place of business at 24-16 Queens Plaza South, Long Island City, NY 11101. Mr. Selvaggio has been  a member in good standing of the union since 1985.

3

## FACTS

6.  In 1966, Michael A. Selvaggio, Jr., began working as journeyman/pressman for the Daily News. In 1973, Mr. Selvaggio became a shape newspaper deliveryman for the Daily News, and in 1985 he became eligible to join, and joined the NMDU. He has been a member of the NMDU ever since.

.

7.  On October 21, 2006 the grievant entered into a "Last Chance Agreement" (hereinafter "LCA") which stated the specific terms and conditions for Mr. Selvaggio's continued employment. Said, Last Chance Agreement stated, *inter alia*:

> This is to set forth the terms and conditions of the return to employment of Michael (sic) Selvaggio ("Selvaggio"). Selvaggio was terminated by Daily News L.P. (the "Daily News" or "Company") for violating various Company policies.
>
> The parties agree that Selvaggio will be permitted to return to work at the Daily News subject to the following conditions:
>
> 1. Selvaggio shall be reinstated without back pay or related benefits, e.g. fund contributions or "P" day credits, to the Steady List effective October 21, 2005.
>
> ***
>
> 3. Selvaggio will be subjected to discipline that the Daily News deems appropriate, up to and including discharge, in the event Selvaggio violates any of the Company's Delivery rules or procedures.  In the event Selvaggio is disciplined, the NMDU may submit to grievance and arbitration only the questions whether Selvaggio violated any of the Company's Delivery rules and

4

procedures.  If the arbitrator finds that Selvaggio violated any of the Company's rules or procedures he shall have no authority to reduce the discipline imposed by the Daily News or to consider any mitigating factor's on Selvaggio's behalf.

\*\*\*

7. The terms of this agreement shall remain in effect for so long as Selvaggio is employed by the Daily News, unless the parties agree otherwise, in writing.

8.  On July 16, 2007, Mr. Selvaggio was terminated from his job as a newspaper delivery man because he was allegedly in possession of Daily News newspapers.  The Daily News terminated Mr. Selvaggio because although he did not take the newspapers, having said newspapers near him raised an inference that he would take the papers, and although there was no proof that he took the papers, the Daily News terminated him in anticipation of an act, and not the act itself.  The LCA did not provide for discharge for the anticipation of an act.

9.  The Daily News terminated Mr. Selvaggio for violating a Delivery Department Rule, which it contends, under the LCA was grounds for discipline, up to and including discharge. The Delivery Department Rules states, in part:

These Delivery Office Rules are designed to ensure an orderly, safe, and efficient operation and are in accordance with normal and accepted standards of personal conduct. Violations of these rules will necessitate disciplinary action.

1. It shall be a violation of the Delivery Department Rules to

\*\*\*

G.  Remove  company  property  from  the  premises  without

5

authorization.

***

5. Each employee will be held responsible for the accuracy of the number of loads on the truck as well as ensuring that there are no unauthorized copies in each odd bundle, unless the odd is made automatically. Shortages or overages must be reported promptly to the foreman. Any overages or comic, magazine, sections or mains must be returned to the plant.

10.  On June 16, 2007, Mr. Larry Arenson, Mr. Selvaggio's supervisor, was walking to the loading dock when he walked in to the driver's room where Mr. Selvaggio was working.  He saw Mr. Selvaggio's manifest on the top of twenty papers, and, believing he was going to take them out of the building, fired Mr. Selvaggio.  Mr. Selvaggio stated he had nothing to do with the loose papers that were on the table and that said papers were in the driver's room before he came into the room.

11.  Mr. Arenson never saw Mr. Selvaggio pick up the bundle of papers.

12.  Mr. Arenson never saw Mr. Selvaggio take the papers out of the building.

13.  Mr. Arenson admitted, that he recommended that Mr. Selvaggio be terminated without seeing him take any papers.  In sum, the Daily News terminated Mr. Selvaggio without proof that he violated any disciplinary rule or the LCA..

14.  Upon information and belief the rules of the Daily News and/or the LCA do not

include anticipatory violations, and Mr. Selvaggio did not violate any rule or regulation of the LCA and/or the rules of the Daily News.

15.    Thereafter, Mr. Arenson notified Mr. James Brill, the Senior Vice President of Operations for the Daily News, that Mr. Selvaggio had been "caught with unauthorized papers." Mr. Brill the made the decision to terminate Mr. Selvaggio based on the fact that he "was caught with unauthorized papers."

16.    On July 16, 2007, Mr. Selvaggio was terminated by the Daily News for violating the LCA.

17.    Thereafter Mr. Selvaggio's collective bargaining representative, the NMDU, filed a grievance on his behalf.  After several stages of grievance hearings, the NMDU filed for arbitration.

18.    From the time he was terminated on June 16, 2007, until the date for the arbitration on February 15, 2008, Mr. Selvaggio contacted the NMDU many times and requested an opportunity to come in and prepare the case for arbitration.  The NMDU refused to return his calls or prepare him for the arbitration.  In this regard, the NMDU changed the firm assigned to represent Mr. Selvaggio.  In addition, Mr. Selvaggio, gave the NMDU the names and addresses of witnesses that could testify on his behalf, but the NMDU refused or failed to contact the witnesses.  Said witnesses were not called during the arbitration, even though, upon information

7

and belief, they could have significantly strengthened Mr. Selvaggio's case, to wit: Mr. Selvaggio has several witnesses that could have testified that the papers were in the driver's room before Mr. Selvaggio entered, thus discrediting the employer's theory that he took the papers in anticipation of taking them out of the driver's room.

19. From the time he was terminated to the date of the arbitration on February 15, 2008, Mr. Selvaggio told the NMDU that he had not violated the LCA in that he did not steal anything, nor was he anticipating stealing anything, and that he could not be found in violation of the LCA. Nevertheless, the NMDU refused to make a motion to dismiss or litigate the threshold jurisdictional issue.

20. On February 15, 2008,Mr. Selvaggio's arbitration was held. It became very clear to Mr. Selvaggio that his representative was unprepared to represent him. His representative from the NMDU had not contacted the witnesses he had told them could testify on his behalf, and the NMDU had failed to subpoena or have said witnesses prepared to testify at the arbitration. In addition the NMDU had not prepared him for his testimony, and had not marshaled the legal issues or the facts. The union representative did not seem interested in the case and barely cross-examined the employer's witnesses. When he did cross-examine the witnesses, he failed to show the contradictions in the witnesses' stories. In sum, the representation was entirely perfunctory and did not exhibit even a modest display of a zealous advocacy or advocacy. It became clear to Mr. Selvaggio that his representative was not prepared to truly fight for him.

21.  In or about March 24, 2008, the decision of the arbitrator, Bonnie Siber Weinstock, was then sent to Mr. Selvaggio's representative, the NMDU. (See Exhibit A).  Although the arbitrator specifically stated that the issue presented to her was " Did Michael Selvaggio violate any of the terms of his Last Chance Agreement? If not what shall be the remedy?" (See Exhibit A, page 2) and although the Arbitrator cited the specific applicable rules (which have been stated in paragraph 9 of this amended complaint), the arbitrator went far beyond her jurisdictional mandate in determining that even though no rule was violated:

> The Arbitrator finds that the Union is technically correct that the Grievant was stopped before he removed the papers from the drivers' room.  To be sure, Mr. Arenson should have waited for the Grievant to leave the driver's room with the papers to confirm that they were being removed from the premises.  However, it would exalt form over substance if the Arbitrator were to exonerate the Grievant simply because he was interrupted before he could carry the papers out of the drivers' room.

Therefore, the arbitrator admitted that Mr. Selvaggio never took anything out of the driver's room and that there was no violation of the LCA. The arbitrator's decision is in stark violation of her jurisdictional mandate and as such is in violation of New York State law and rules and said decision must be vacated pursuant to Article 75 of the New York Civil Practice and Rules.

22.  In or about early April of 2008, Mr. Selvaggio was informed of the decision of the arbitrator.  The NMDU refused to meet with him regarding the decision until April 28, 2008.

23.  When Mr. Selvaggio read the decision of the arbitrator he was shocked because the

arbitrator, among other things, ruled that Mr. Selvaggio did not take the papers, but, as the arbitrator stated, the fact that he had not taken the papers was of no merit because, , he nevertheless should be terminated because he would have taken the papers. In sum, the arbitrator assumed he would have violated the LCA, although he did not violate the LCA.

24. In or about April 28, 2008, the NMDU met with Mr. Selvaggio for the first time regarding the decision of the arbitrator. At this meeting, Mr. Selvaggio demanded that the NMDU appeal this decision of the arbitrator because he was fired without violating a rule, without violating the LCA and without any just cause whatsoever in violation of the collective bargaining agreement, and Mr. Selvaggio told the NMDU that the arbitrator went far beyond her jurisdictional mandate in failing to rule on the specific issue presented to her; whether Mr. Selvaggio had specifically violated the LCA.

25. The NMDU stated that although the decision was terrible, and even though the arbitrator did rule beyond her jurisdictional mandate, they would not appeal the decision because, among other things, it was too expensive and hard to prevail. The NMDU gave no explanation for its failure to contact Mr. Selvaggio for almost a month after receiving the decision. The NMDU did not tell Mr. Selvaggio of the statute of limitations for filing a petition to vacate the arbitrator's decision, even though Mr. Selvaggio urged the union to move to vacate the decision.

26. On Friday, June 20, 2008, Mr. Selvaggio went to the *pro se* office of the Supreme

Court of the State of New York, County of New York Courthouse at 60 Centre Street to file a *pro se* petition to vacate the arbitrator's decision.  The *pro se* office gave Mr. Selvaggio the necessary forms but told him that he would have to come back on Monday June 23, 2008.  Mr. Selvaggio returned on Monday June 23, 2008 and filed his petition to vacate the arbitrator's decision.  In his petition, which is attached as Exhibit B, Mr. Selvaggio maintained that he was terminated in violation of the Last Chance Agreement, the collective bargaining agreement and the laws of the State of New York and the United States.

27.  Thereafter, on July 22, 2008, the respondent Daily News, L.P., filed a Notice of Removal to the United States District Court for the Southern District of New York and on Or about July 25, 2008, Mr. Selvaggio was served with the Notice of Removal.

## FIRST CAUSE OF ACTION

28.  The actions and omissions of the NMDU, in failing to represent Mr. Selvaggio in a reasonable manner, in  refusing to prepare for his arbitration, in refusing to meet with him in a manner that was reasonable under the circumstances to prepare for the arbitration, in failing to contact or call the witnesses that Mr. Selvaggio gave them that could have supported his case, that the NMDU failed to contact him, that the NMDU failed to contact him about the decision of the arbitrator, that the NMDU failed to appeal the decision of the arbitrator, and that the Daily News terminated him without just cause violated Mr. Selvaggio's rights as secured by 29 U.S.C.

§185 and as such he has been damaged.  In addition, the Daily News terminated him in violation of the collective bargaining agreement because he was terminated for no cause. The NMDU is sued for breaching it duty of fair representation in that its actions were arbitrary and baseless.

## SECOND CAUSE OF ACTION

29.  Mr. Selvaggio repeats and restates paragraph one (1) through twenty-eight (28) and incorporates them as paragraph twenty-nine (29) herein.

30.  The actions and omissions of the defendant NMDU in violating its duty of fair representation in failing to adequately prepare or litigate the arbitration of Mr. Selvaggio in the manner as has been stated in paragraph twenty-nine (29) and failing to appeal the baseless decision of the arbitrator and the violation of the Daily News in terminating him in violation of the contract lead to the baseless decision of the arbitrator which is in violation of New York State law, Civil Procedure Law and Rules Article 75 and since the arbitrator went far beyond her jurisdictional mandate and beyond what is considered settled law in the State of New York and the United States of America, to wit: that no one can be convicted of a misfeasance simply because of the possibility something may happen in the future, when no consummatory act in furtherance of the misfeasance took place, requires the vacating of the arbitrator's decision pursuant to Article 75 of New York State Civil Practice Laws and Rules. The arbitrator far exceeded her jurisdictional mandate, and failed to apply the settled law in the State of New York

and the United States and as such Mr. Selvaggio has been damaged. Therefore, the plaintiff demands that pursuant to Article 75 of the CPLR that the arbitrator's decision be vacated.

**WHEREFORE,** the Plaintiff, Michael Selvaggio respectfully requests:

1. Vacating the arbitrator's decision because she went far beyond her jurisdictional mandate and her interpretation of the law and facts violated the settled law in the State of New York and the United Sates of America.

2. Injunctive relief including reinstatement and full back pay and all attendant benefits;

3. Compensatory damages;

4. Pre and post-judgment interest;

5. Attorney's fees and costs;

6. Punitive damages against both defendants;

7. Any other and further relief that this court deems just and appropriate.

Dated: August 8, 2008
New York, New York

                                                        /s/
-                                    --------------------------------------------
                                     Noah A. Kinigstein (3326)
                                     Attorney for Selvaggio
                                     315 Broadway, Suite 200
                                     New York, NY 10007
                                     (212) 285-9300

To: Neil H. Abramson, Esq.
    Proskauer Rose LLP
    1585 Broadway
    New York, NY 10036

Newspaper and Mail Deliverers Union of New York and Vicinity
24-16 Queens Plaza, South
Long Island City, NY 11101

American Arbitration Association
Office of General Counsel
1633 Broadway, Floor 10
New York, NY 10010-6708

I, Noah A. Kinigstein being an attorney duly licensed to practice law in the State of New York affirms the following under penalties of perjury:

    1. On August 8, 2008 I served the within First Amended Complaint by mailing a copy of the First Amended Complaint to each of the following persons at the last known address set forth after each name below by first class mail:

| | |
|---|---|
| Neil H. Abramson, Esq. | American Arbitration Association |
| Proskauer Rose LLP | Office of General Counsel |
| 1585 Broadway | 1633 Broadway, 10th Floor |
| New York, NY 10036 | New York, NY 10019-6708 |

Dated: New York, New York
      August 8, 2008                      /S/
                                   --------------------------------------
                                      Noah A. Kinigstein

[Print in **black** ink all areas in bold letters.]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------x
In the Matter of the Application of

_____Michael Selvaggio Jr,_____,
**[fill in name(s)]**              Petitioner(s)

- against -

_New York Daily News, ~~&~~ L.P._
_AMERICAN ARBITRATION ASSOCIATION,_

_____,
**[fill in name(s)]**              Respondent(s)
--------------------------------------------------------------x

**Index Number**

**08/401493**
/AMENDED
NOTICE OF PETITION

RECEIVED
JUL 2  2008
IAS MOTION SUPPORT OFFICE
NYS SUPREME COURT - CIVIL

PLEASE TAKE NOTICE that upon the verified petition(s) of _Michael Selvaggio Jr._
_____, **[your name(s)]**, sworn to on _June 23ʳᵈ_, 200 _8_
**[date Verified Petition notarized]**, and the attached exhibits, petitioner(s) will request this Court,
at 9:30 AM on the _29_ day of _July_____, 200 _8_, **[return date]** at the Courthouse, at
60 Centre Street, New York, N. Y., in the Motion Support Courtroom, Room 130, for a judgment,
pursuant to the Civil Practice Law and Rules (CPLR), granting the following relief to the
petitioner(s): **[briefly describe what you are asking the Court to do]** _Vacate  Decision_
_Per  Article 57511 (iii)_____
_____
_____
_____

and for such other and further relief as this Court may deem just and proper.

Dated: ___~~JUN 2 3 2008~~___, 200___
**[date signed]**

Respectfully submitted,

_____Michael Selvaggio Jr._____
_____11  Harding St,_____
_____SmithTown,  NY  11787_____
_____631-656-4001_____
                  Petitioner(s)

To: Respondent(s)
_New York Daily News ~~&~~ L.P._  **[your name, address, telephone number ]**
~~_____~~ _450 WEST_
~~_____~~ _33ʳᵈ ST, NEW YORK_
_1-212-210-2100  N.Y. 10001_
**[name, address, telephone number]**



4-06

[Print in *black* ink to fill in the spaces next to the instructions]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x
In the Matter of the Application of

_____ MicHael Selvaggio Jr, _____,
[fill in name(s)]                    Petitioner(s)

- against -

_____ New York Daily News, ███ L.P.
AMERICAN ARBITRATION ASSOCIATION.

_____,
[fill in name(s)]                    Respondent(s)
-------------------------------------------------------------------x

**Index Number**

08/401493

VERIFIED PETITION

TO THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK:

The petition of _____ MicHael Selvaggio Jr, _____ [your name] respectfully
shows to this Court as follows:

1. Petitioner resides at _ 11 Harding St, SmiTHTown, NY, 11787 _
_____ [your address]

2. The respondent(s) is/are [identify the respondent(s)] _____
_ New York Daily News Inc, _____
_____
_____

3. [Describe what you are requesting. Add more pages if needed. If you are appealing
the decision of a government agency, give the date and outcome of the final determination.
Explain why this Court should reverse that decision.] _ I am requesting That the
courT vacate the decision filed By Madame ArbiTraTor Bonnie Siber WeinsTock
because she went outside and beyond the issue that broughT us To ArBiTraTe.
(Accused of stealing papers that were left on a TaBle in a common use room that
I was standing by while gathering work supplies). Referencing NY CPLR,
ArTicle 5251 (iii), I was accused of doing something that never happened, as
The decision affirms, I was not in posession of any papers. Conversation
during The hearing which was refuTed by my Council & agreed To as not
relevent because The measure by which I was "assumed To be Guilty",
I have been with The Daily News for approximaTely 38 years and

Have had multiple injuries sustained while carrying out my job. Employment at this time is questionable as the explanation for leaving employment is obviously undesirable to any future employer. To lend detailed information in explanation to my current status looks suspicious to someone who is unfamiliar with the industry & work environment, who might be looking to employ me. The reason for dismissal is based on assumption of theft.

I am attaching further information to ~~xxxx~~ shed ~~xxxxxxxxxxxxxxxxxxx~~ some clarity to the event of June 16, 2007 that brought about Arbitration. I have been unemployed since this date. I have also actively sought employment, at this time in an attempt to continue my education I obtained a HAZMAT endorsement for my drivers license but I am 57½ years of age and employment is difficult at this juncture.

4. Attached are copies of all relevant documents. **[Attach the decision you are asking the court to reverse as Exhibit A. Attach any other documents as Exhibit B, Exhibit C, and so on. List additional Exhibits on separate page.]**

Exhibit A - Decision By Arbitrator

Exhibit B - Decision (most current) from NYS Workers Compensation Board.

Exhibit C - Independent Medical Examination performed by Orthopedic Dr. Acknowledging

Exhibit D - approval for total knee replacement.

Exhibit E -

5. A prior application (has not)/ has **[circle one]** been made for the relief now requested.
**[If you made this application before in this or any other court , describe where, when, the result and why you are making it again.]**

WHEREFORE, your deponent respectfully requests that this Court [*briefly* describe what you are requesting]: _Vacate Decision of Arbitrator_ _Referencing Article 75_

_____JUN 2 3 2008_____, 200___
**[date signed]**

_____
Petitioner **[sign your name]**

_Michael Selvaggio JR._
**[print your name]**

_11 Harding St._
_Smithtown, NY 11787_
_631 - 656-9001_
**[your address and telephone no.]**

## VERIFICATION

STATE OF NEW YORK
COUNTY OF ___New York___ : ss:

___Michael Selvaggio Jr.___ **[your name]**, being duly sworn, deposes and says that: I am the petitioner in this proceeding; I have read the foregoing petition and know the contents thereof; the same is true to my own knowledge, except as to matters therein stated to be alleged on information and belief; and as to those matters I believe it to be true.

Sworn to before me on
_____JUN 2 3 2008_____
___ day _____, 200___

_____
Notary Public

**LINDA MARENTES**
Notary Public, State of New York
Reg. No. 01MA45061795
Qualified in Kings County
Certificate Filed in New York County
Commission Expires June 17, 20__

_____
Petitioner **[sign your name in front of a Notary]**

_____
**[print your name]**

VerPet4-06

June 23, 2008

To whom this may concern:

I am requesting that the court vacate the decision rendered by Madame Arbitrator Bonnie Siber Weinstock because she went outside and beyond the issue that brought us to arbitration. Referencing: NY CPLR, Article S7511 (iii).

I was accused of doing something that never happened, as the arbitrator states in the decision. Despite this observation, the arbitrator comes to the conclusion of guilt by drawing upon other pieces of information primarily supplied by my accusers, which were not part of the incident that brought us to arbitration. In an attempt to justify this, the arbitrator rules on the supposition as to what my intention was instead of remaining impartial and looking at the facts of the incident, as were brought before her about the night in question (June 16, 2007).

I was accused of stealing approximately nineteen waste papers that were lying on a lunch/common-use table connected to our supply-room. These papers were not on my person nor did they leave the room or premises. I occupy and use the work facility in the same manner as any other co-worker that has the same job description as me. The time in which I choose to use this room is not determined by anyone else and is at the discretion of each individual. There are no time restrictions for use of this room or regulations as to acquisition of necessary supplies to carry out my job as deemed necessary (i.e. release forms, permission slip for access etc.). By all accounts, I do not see the crime that I was accused of committing proven, as it did not occur.

I have a 70% permanent disability to my left hand (I have no feeling in this hand as well as loss of range of motion. I have limited dexterity) and a 30% loss to my right hand. I am also approved for knee replacements for the left and right knees due to multiple injuries from an accident through my employment. In addition, there are multiple herniated discs with loss of range of motion. ["How is it improbable for me to tie up my supplies?" How could I possibly stand balanced on one leg to tie papers on a table; while weighing 260lbs with two bad knees?] These disabilities are filed with the NYS Workers Compensation Board and have been brought before law judges which show without prejudice my condition and/or limitations.

On my behalf, there are many compelling details behind the accusations that were made before the arbitrator to depict my work ethic as questionable but none were addressed by counsel because they were considered irrelevant to the accusation (stealing papers on 6/16/07) that brought us to arbitration. I was assured over and over by counsel that the law states burden of proof is on the accuser. However, it appears that the measure by which the arbitrator came to her conclusion was based upon assumption.

There are many things I do in my personal life in service to my fellow man; the soup kitchen is only a tiny part of my volunteer work but, it became the excuse my employer used to justify why I would be "stealing" in their opinion. The fact that after surveying approximately one hundred dealers on my route showed no discrepancies in regard to newspapers and un-authorized papers was not considered. The last-chance-letter was brought about through an incident that was created by misinformation between the company and its customer (despite my attempt to help the customer) who refused to lodge a complaint against me.

I came to the proceedings with the belief that the law governing all men as being created equally would be upheld and the measure of the law is the same for each and every one of us. When accused of a crime, to be found guilty, it must be proven without doubt that the crime was committed. The burden of proof is on the accuser. However, my understanding as to why we entered arbitration was to bring witness before an impartial third party about the events of June 16, 2007 of which I was accused of that resulted in my termination.

Thank you for your consideration of this matter,

Michael Selvaggio Jr.

MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

COUNSELORS AT LAW

990 STEWART AVENUE, SUITE 300
P.O. BOX 9194
GARDEN CITY, NEW YORK 11530-9194
516-741-6565
FACSIMILE 516-741-6656

ONE COMMERCE PLAZA
SUITE 1705
ALBANY, NEW YORK 12260
518-465-5551
FACSIMILE 518-465-2033

1350 BROADWAY, SUITE 501
P.O. BOX 822
NEW YORK, NEW YORK 10018-0026
212-239-4999
FACSIMILE 212-239-1311
E-MAIL: meyersuozzi@msek.com
WEBSITE: http://www.msek.com

1300 CONNECTICUT AVENUE, N.W.,
SUITE 600
WASHINGTON, DC 20036
202-955-6340
FACSIMILE 202-223-0358

425 BROADHOLLOW ROAD, SUITE 405
P.O. BOX 9064
MELVILLE, NEW YORK 11747-9064
631-249-6565
FACSIMILE 631-777-6906

BARRY J. PEEK
DIRECT DIAL 212-763-7061
E-MAIL: bpeek@msek.com

March 24, 2008

<u>**Via Facsimile and Regular Mail**</u>

Rocco Giangregorio
Business Agent
Newspaper and Mail Deliverers' Union
24-16 Queens Plaza South, Room 306
Long Island City, NY 11101

> Re:  NMDU - Daily News
>      Michael Selvaggio - Discharge
>      Our File No. 16199.0237

Dear Rocco:

Enclosed herein please find the Opinion and Award of Arbitrator Bonnie Siber Weinstock as well as her invoice in regard to the above captioned matter. Unfortunately, Arbitrator Weinstock ruled that the Company had just cause in discharging Mr. Selvaggio and denied the grievance filed on his behalf.

If you have any questions, please feel free to contact me.

Very truly yours,

BARRY J. PEEK

BJP:kk
Enclosure

cc:  Douglas Panattieri, President (w/enc.)
     James DeMarzo (w/enc.)
     Irwin Bluestein (w/enc.)

93789

AMERICAN ARBITRATION ASSOCIATION, Administrator

LABOR ARBITRATION TRIBUNAL

In the Matter of the Arbitration

    between

NEWSPAPER AND MAIL DELIVERERS' UNION
   OF NEW YORK AND VICINITY

    and

DAILY NEWS, L.P.

OPINION and AWARD
Case #13 300 01644 07
(Michael Selvaggio, Jr.)

BEFORE:  Bonnie Siber Weinstock, Arbitrator

APPEARANCES:
    For the Union:    Meyer, Suozzi, English & Klein, by Barry
                      J. Peek, Esq. - Counsel
                    Michael Selvaggio, Jr. - Grievant
                    James DeMarzo - Vice-President
                    Steven Goldstein - Secretary Treasurer
                    Rocco Giangregorio - Business Agent
                    Also Present: Brian Metten, John
                      Salonia, Rich Couch, Garry Ketcham,
                      Douglas Panattieri, Linda Selvaggio,
                      Audra Katsamanis, Zachary Katsamanis,
                      J. Rodgen

    For the Employer:  Proskauer Rose, LLP by Kathleen McKenna,
                      Esq. - Counsel
                    Daniel P. Murphy, Esq. - Vice-President
                    and Assistant General Counsel
                  James R. Brill - Sr. Vice-President of
                    Operations
                  Peter Chimenti - Security Investigator
                  Tom Montello - Security Investigator
                  Larry Arenson - General Foreman

      Newspaper and Mail Deliverers' Union of New York and

Vicinity ("Union") and Daily News, L.P. ("Employer", "Company" or

"Daily News") are parties to a collective bargaining agreement

effective January 7, 1993 as amended ("Agreement"), which

provides for the arbitration of unresolved grievances.  Pursuant

to the Agreement, the parties appeared before the undersigned on

2

February 15, 2008 for a hearing on the grievance described below. The Arbitrator was selected pursuant to the Labor Arbitration Procedures of the American Arbitration Association whose rules governed this proceeding. The parties had full and fair opportunity to examine and cross-examine sworn (or affirmed) witnesses and to present evidence and argument in support of their respective positions. The record was declared closed after oral summations on February 15, 2008.

## ISSUES

At the hearing on February 15, 2008, the parties were unable to agree upon the issue for arbitration. However, the parties agreed that the Arbitrator could frame the issue. Upon consideration of the arguments of the parties, the Arbitrator finds the issue for arbitration to be:

> Did Michael Selvaggio, Jr. violate any of the terms of his Last Chance Agreement? If not, what shall be the remedy?

## BACKGROUND

Michael Selvaggio, Jr., the Grievant, has been employed by the Daily News since 1966, the last 38 of those years as a driver. On October 21, 2005, the Grievant entered into a Last Chance Agreement ("LCA") (E-1)[1] which returned him to work after

---

[1] Joint exhibits are cited herein as "J--"; Employer offered exhibits are referred to as "E--" and Union exhibits are cited as "U--."

a termination for violating various Company policies. On July 18, 2007, the Grievant was terminated under the LCA for allegedly violating Company policies. (J-1). The instant grievance followed to protest that termination.

The Employer contends that the Last Chance Agreement enables the Company to impose discipline that it believes is appropriate if the Grievant violates Company rules or procedures. In this case, the Grievant was found to be in possession of Company property (i.e., newspapers) on June 16, 2007 without authorization. When confronted, the Grievant stated that he was giving the newspapers to a soup kitchen at which he volunteered. The Company insists that this is the third time that the Grievant has been in possession of unauthorized papers. The Company urges that the Grievant was clearly placed on notice, both in the LCA and in the two instances prior to the one in issue, that the possession of unauthorized newspapers would result in his discharge. The Company argues that since the LCA, there have been infractions of various rules, and the Employer did not rush to terminate the Grievant. Therefore, the Employer maintains that it has given the Grievant numerous opportunities to conform his behavior to the Company rules, but the Grievant has failed to do so. The Employer insists that discharge is the appropriate penalty for the Grievant's violation of his Last Chance Agreement. It asks that the grievance be denied.

The Union, on the other hand, urges that the Grievant

4

did not violate the LCA and, instead, he was the victim of the
precipitous action of his supervisor who has a long history of
animus against the Grievant. The Union insists that the Grievant
did not leave the break room, let along the Employer's premises,
with any unauthorized newspapers and, therefore, he was not in
violation of any Company rule. The Union asks that the Grievant
be reinstated and made whole for lost wages and benefits.

## DISCUSSION

When the Grievant entered into the Last Chance
Agreement in 2005, he became obligated to abide by its terms.
Likewise, the Arbitrator's authority is circumscribed by the
terms of the LCA which states, in pertinent part (E-1):

> This is to set forth the terms and conditions of the
> return to employment of Micheal (sic) Selvaggio
> ("Selvaggio"). Selvaggio was terminated by Daily News,
> L.P. (the "Daily News" or "Company") for violating
> various Company policies.
>
> The parties agree that Selvaggio will be permitted to
> return to work at the Daily News subject to the
> following conditions:
> 1.   Selvaggio shall be reinstated without back pay
> or related benefits, e.g., fund contributions or
> "P" day credits, to the Steady List effective
> October 21, 2005.
>           * * *
> 3.   Selvaggio will be subject to discipline that
> the Daily News deems appropriate, up to and
> including discharge, in the event Selvaggio
> violates any of the Company's Delivery rules or
> procedures. In the event Selvaggio is
> disciplined, the NMDU may submit to grievance and
> arbitration only the questions whether Selvaggio
> violated any of the Company's Delivery rules and
> procedures. If the arbitrator finds that
> Selvaggio violated any of the Company's rules or
> procedures he shall have no authority to reduce
> the discipline imposed by the Daily News or to

5

> consider any mitigating factors on Selvaggio's
> behalf.
> * * *
> 7.  The terms of this Agreement shall remain in
> effect for so long as Selvaggio is employed by the
> Daily News, unless the parties agree otherwise, in
> writing.

In the instant case, the Company contends that the
Grievant violated a Delivery Department Rule which, under
paragraph 3 of the LCA is grounds for discipline up to and
including discharge.  The Delivery Department Rules state, in
pertinent part (E-2):

> These Delivery Office Rules are designed to ensure an
> orderly, safe and efficient operation and are in
> accordance with normal and accepted standards of
> personal conduct. Violations of these rules will
> necessitate disciplinary action.
>
> 1.  It shall be a violation of the Delivery Department
> Office Rules to:
> * * *
> g.  Remove company property from the premises
> without authorization.
> * * *
> 5.  Each employee will be held responsible for the
> accuracy of the number of loads on the truck as well as
> ensuring that there are no unauthorized copies in each
> odd bundle, unless the odd is made automatically.
> Shortages or overages must be reported promptly to the
> foreman.  Any overages of comic, magazine, sections or
> mains must be returned to the plant.

The facts which gave rise to the Employer's decision to
terminate the Grievant were explained by Larry Arenson and James
Brill.   Mr. Arenson testified that on Saturday morning, June
16th, he was walking to the loading dock when he walked into the
drivers' room.  He saw the Grievant with his manifest on top of a
bundle of approximately 20 papers which the Grievant was in the

6

process of tying. Mr. Arenson explained that he asked the Grievant for the papers and the Grievant gave them to Arenson who then tied the bundle. Mr. Arenson testified to the following conversation with the Grievant in the drivers' room:

> Arenson: I've had enough of you taking papers unauthorized. Go home.
>
> Selvaggio: I'm not taking the papers. You have to give me a break. I've know you 36 years.
>
> Arenson: You have to leave the building or I'll call security and have you escorted out.

Mr. Arenson testified that after these comments were exchanged, he walked to the foreman's office and the Grievant followed him. Once in the office, Mr. Arenson said, "Good bye. Get out of the building." At that point, the Grievant "got up in [Arenson's] face" and put his body against Arenson's and they were "face to face." Mr. Arenson told the Grievant to leave or he would call security, and the Grievant then left.

Mr. Arenson testified that a few weeks before this incident, a foreman told Arenson that the Grievant went to get his odd papers and took an extra ten. Mr. Arenson went to the Grievant who was then in front of his truck and asked for the ten papers, saying, "Give me the ten additional papers. Don't put me in the position of firing you for taking ten papers." The Grievant told Mr. Arenson that he worked in a soup kitchen, and Arenson told him that the Company was in the business of selling papers and Selvaggio should not take them. The Grievant thanked Mr. Arenson and went on his way.

According to Mr. Arenson, a month or two before the incident just described, the Grievant was walking by the number 2 press and grabbed a bundle of papers. Mr. Arenson tapped the Grievant on the back and said, "Michael, put the papers back. This one is on me and don't let me catch you doing it again." Mr. Arenson explained on cross-examination that a driver would have no reason to be grabbing a bundle of papers from the press, yet he "gave [Selvaggio] a break" and did not write him up. Thus, by Mr. Arenson's explanation, the June 16th incident was the third time in a few months, and certainly after the LCA, that the Grievant had been admonished about taking extra papers.

On cross-examination, Mr. Arenson acknowledged that on June 16th as he entered the drivers' room, the Grievant was tying the papers into a bundle, but he did not see the Grievant pick up the papers and start to leave the room. Mr. Arenson explained that he did not wait to see if the Grievant attempted to walk out of the room with the papers because he "had warned him numerous times in the past."

At the hearing, the Union showed Mr. Arenson a box of cord with plastic bags bundled on the side of the box and brown bags below the box, all tied with cord into one neat package.[2] The Union suggested that Mr. Arenson saw the Grievant with this

---

[2] Mr. Arenson acknowledged that the cord used to tied bundles was in a box similar to the one shown at the hearing, though the Company now uses a cord different from that which was used in June 2007, and the plastic bags are used to keep the papers dry. The brown bags are marked "Daily News" and are used for return papers from the dealers. Finally, the white paper, called "wrapper" is used to write addresses and figures on the papers for delivery.

8

neat package of supplies, and he did not see the Grievant wrapping papers.  Mr. Arenson disagreed.

James Brill testified that he made the decision to terminate the Grievant based on information from Larry Arenson that Mr. Selvaggio "was caught with unauthorized papers." According to Mr. Brill, Mr. Arenson found the Grievant in the drivers' room just about to tie up a bundle of papers.[3]  James Brill explained that the drivers come to work and check in with their foreman.  Then they wait in the room referred to herein as the drivers' room.  Mr. Brill acknowledged that a driver may sit with a cup of coffee in that room and "may occasionally grab a paper" to read.  He added that a driver cannot grab 20 papers to read.

In making the decision to terminate, Mr. Brill understood that Mr. Arenson had warned the Grievant two times in the prior 60 days about taking unauthorized papers. One of those times, Mr. Arenson took the papers from the Grievant's truck. Mr. Brill testified that when the Grievant was confronted about this matter at the Joint Conference on July 12, 2007, he stated that he takes the papers to a soup kitchen.  At that conference,

---

[3]  A bundle of 20 papers was presented at the arbitration hearing and admitted into evidence as Employer exhibit 11.  The bundle was tied with cord.  Mr. Brill testified that Mr. Arenson originally tied the papers together after taking them from the Grievant, and Mr. Brill untied them the day before the hearing to look at the bar codes on the papers.  He then retied the bundle. Thus, there is no suggestion that the bundle shown at the arbitration was tied by the Grievant.  Rather, the evidence reveals that the Grievant was interrupted as he was preparing to tie the papers.

the Grievant acknowledged to Mr. Brill that Mr. Arenson caught him taking extra papers, warned him, and they agreed to "move on."

Rocco Giangregorio, the Business Agent present at the Joint Conference, testified that the Union never said and the Grievant never admitted at the Joint Conference that the Grievant took papers, or that he was taking papers to donate to the soup kitchen where he volunteered. Instead, Mr. Giangregorio explained that the reference to a soup kitchen was to show that the Grievant was a person of good character.

The Arbitrator finds that the recurrent theme of the Grievant volunteering in a soup kitchen was not a declaration of public service (however laudable). Rather, it was an attempt to explain the destination for the "extra" papers he had a penchant for collecting. If the Grievant simply wanted to declare his good character, as Mr. Giangregorio asserts, then the Grievant could have referred to his honorable service in the Marines, as did Union counsel at the hearing. The Arbitrator credits Mr. Brill's testimony and finds that the Grievant sought to exculpate himself by explaining that the papers were going to a charitable cause.

The Grievant gave a different account of the events in issue. He testified that on June 16th, he went into the drivers' room at approximately 3:30 AM to pick up supplies for his route. He explained that he took a box of rope, approximately 100 brown bags used for returns, and batches of plastic bags. He tied them

10

all together, using the rope to make a handle out of this package of supplies so it could be carried with one hand.

The Grievant first stated that "there were <u>bundles</u> of newspapers sitting on the table" in the drivers' room, and then he said that "papers were scattered on the three or four tables in the room." The Grievant stated that when Mr. Arenson entered the room, the Grievant's back was to the door. The Grievant testified to the following conversation:

> Arenson (pointing to the papers on the table): What's that?
>
> Selvaggio: I don't know. It's not mine.
>
> Arenson: I think it is.
>
> Selvaggio: It's not mine.
>
> Arenson: You are suspended. Hand me your galley.
>
> Selvaggio: Why am I suspended?
>
> Arenson: For stealing papers.
>
> Selvaggio: I didn't steal anything.

The Grievant testified that he and Mr. Arenson "exchanged some words" and that Arenson "seemed enraged." The Grievant acknowledged following Arenson to the office to try to find out why he thought the Grievant was stealing papers. Contrary to Mr. Arenson's testimony that the Grievant "got in his face," the Grievant testified that he sat on the desk in the office and "let Mr. Arenson rant and rave." The Grievant denies raising his voice and claims that Arenson cursed at him. The Grievant strenuously denies trying to intimidate Mr. Arenson and denies trying to remove papers without authorization on June 16th.

11

On cross-examination, Mr. Selvaggio explained that he does collections on Wednesday and into Thursday. Therefore, he was taking the brown return bags on Saturday, "even though I won't get returns until Thursday." The Grievant testified that he put the supplies in his car; he did not leave the supplies in his truck. The Grievant explained that on June 16th he was delivering the Saturday issue and the inserts for Sunday. Thus, by the Grievant's testimony, on the one day when he would be busy coordinating the deliveries of the Saturday paper with the inserts for Sunday, he also was preparing supplies that he would not need until the following Thursday. The Arbitrator finds this explanation to strain credulity.

The Grievant then testified that he needed supplies to tie up his bundles. This might explain his need for the cord, but it does not explain why the cord, if potentially needed that day, was strung together in a tight package with the plastic and brown bags which were not needed that day.

The Arbitrator further finds that the Grievant's explanation about tying supplies makes little sense in the context of the timing that night. The Grievant testified that on the night in question, his order was "near the bottom" so he was the next to last person to load his truck. Despite the testimony that all the other trucks were being loaded before his, he waited until his truck was loaded and then went back into the drivers' room to get his supplies. One might expect that if the Grievant were waiting around for all the other trucks to be loaded, he

might have used that time to get his supplies ready. Instead, he is "near the bottom" of the list, implying he waited around for a time while his truck was waiting to be loaded, and then, when he should have begun his route, he first went back into the drivers' room for supplies. The Arbitrator finds this chronology to be illogical and the explanation for his presence in the drivers' room with the bundle of papers to be incredible.

As a further example of the incredulity of the Grievant's story, he denied saying to Mr. Arenson, "How can you being doing this? We've known each other 36 years. We were on strike together." The Arbitrator finds that if the Grievant's version of the events were credited, he followed Mr. Arenson into the office after Arenson told him he was suspended, Arenson ranted and cursed at him, and he did not raise his voice. The Grievant does not offer what words he uttered; he simply denies the comments to which Mr. Arenson testified. Yet, the remarks attributed to the Grievant by Mr. Arenson are sympathetic and logical. When told that he is being suspended, it is logical for the employee to either assert his innocence or plead for consideration. According to the Grievant, he did neither.

Upon thorough consideration of the evidence in the record, the Arbitrator finds that Mr. Arenson's testimony was clear and precise that he entered the drivers' room and found the Grievant in the process of tying a bundle of papers. For the reasons stated above, the Arbitrator rejects the Grievant's claim that he was tying his supplies and finds, instead, that the

13

Grievant was interrupted by Mr. Arenson as the Grievant was tying the bundle of papers.

The Arbitrator finds that the Union is technically correct that the Grievant was stopped before he removed the papers from the drivers' room. To be sure, Mr. Arenson should have waited for the Grievant to leave the drivers' room with the papers to confirm that they were being removed from the premises. However, it would exalt form over substance if the Arbitrator were to exonerate the Grievant simply because he was interrupted before he could carry the papers out of the drivers' room. First, there is no other logical conclusion but that the Grievant was preparing to remove the papers from the drivers' room. The Arbitrator has found that the papers were being tied in a bundle. There would be no reason to bundle the papers if they were not being removed from the premises. Even if the Grievant were tidying up the wrap room from the papers strewn about, and he did not suggest that he was, there would be no reason for the Grievant to be tying the papers into a bundle. The cleaning process would be accomplished by simply stacking the papers into piles. Here, the Grievant was seen tying the papers and the Arbitrator credits that testimony. The Arbitrator rejects the Union's argument that the Grievant was only looking at the paper and did not do anything.

Second, if the Grievant were bundling odds for his route, surely he would have stated that to Mr. Arenson to exculpate himself. He never made that claim. (Of course, such a

claim would have been subject to verification on his manifest.)

Third, all parties agree that the papers in issue were waste. They were not suitable for delivery and there is every indication that the Grievant knew this. Therefore, there can be no suggestion that he was tying the bundle to facilitate the destruction of the papers, as no one asked him to do so and it was not his responsibility to dispose of waste papers.

Fourth, there is no indication that the Grievant intended to carry out the bundle of papers for some purpose that did not constitute misconduct. The Grievant denies any of the actions, so he has not suggested a legitimate purpose for commencing the process of tying the papers. That leaves the Grievant with the assertion that he had no intention of removing the papers from the drivers' room and that Mr. Arenson's actions were completely precipitous and motivated by animus. The Arbitrator has considered this argument and finds it unavailing.

The Union next argued that no one saw the Grievant bring the papers into the drivers' room. The Arbitrator finds that while true, that fact is irrelevant. The Grievant can be culpable of removing Company property without authorization and having extra inventory on his truck or in his possession, even if he collected all the previously read papers strewn about the drivers' room and removed those papers. The misconduct is not predicated upon the Grievant removing the papers from one area (e.g., the press area) and carrying the papers to the drivers' room.

In stark contrast to the Grievant's illogical testimony is the clear and precise testimony of Mr. Brill. He recounted the discussion at the Joint Conference in which the Grievant said he had the papers in question in his possession on June 16th. Mr. Brill clearly recalled the Grievant stating that he took the papers to a soup kitchen. The Grievant also admitted to Mr. Brill that Mr. Arenson had previously warned him not to take extra papers. The Grievant admitted being "caught" by Mr. Arenson but stated "we moved on." The Arbitrator credits Mr. Brill's testimony and finds that the Grievant made these admissions during the Joint Conference. The Grievant's contrary testimony at arbitration is a contrived attempt to keep his job.

For all of these reasons, the Arbitrator finds that the Grievant was observed tying papers into a bundle in the drivers' room in the early hours of June 16th. The only logical explanation is that the Grievant was tying the bundle and intended to remove that bundle from the drivers' room. The fact that he was interrupted before he could remove the papers does not change the conclusion that there was no legitimate reason the Grievant would have been in possession of a bundle of waste papers, even if he had not yet left the drivers' room with them. Any suggestion that the Grievant was "caught" before he actually committed the violation of the "letter of the rule" must be rejected in light of the fact that the Grievant had two prior instances, all under the Last Chance Agreement, of taking unauthorized papers where the Employer "gave Mr. Selvaggio a

break."   The Grievant has exhausted his "breaks."

The record is clear that the papers fell into the category of "unauthorized" papers, and the Grievant had no permission or authority to take unauthorized papers. Accordingly, the Grievant is guilty of violating an important rule of conduct for drivers.  As indicated above, paragraph 3 of the Last Chance Agreement placed the Grievant on notice that he would be disciplined, up to and including discharge, for violation of the Company's rules.  Paragraph 3 of the LCA also provides that in any grievance or arbitration regarding a breach of the LCA, the Arbitrator is without authority to modify the penalty selected by the Employer if the Grievant is found to have violated the Company's rules.  Even if the Arbitrator were empowered to modify the penalty, the facts of this case do not suggest that the Employer was arbitrary or capricious in its decision to terminate Mr. Selvaggio.

Specifically, with respect to the Grievant's discipline from the date of the LCA (October 21, 2005) until the June 16, 2007 incident, the record reveals that the Grievant received an oral warning dated January 20, 2007 for reporting to work late at 2:15 for an 11:00 start. (E-5).  In addition, the failure of Mr. Arenson to terminate the Grievant when he was three hours late for work on January 20th indicates that, contrary to the Union's argument, the Employer was not looking for every possible reason to terminate the Grievant under the Last Chance Agreement. Instead, the Arbitrator concludes that the Employer was forgiving

of some of the Grievant's failures and that he received a certain degree of leniency from the Employer.

On May 31, 2007, James Brill notified Larry Arenson that he had received a complaint about a driver going the wrong way down a one way street in Elmhurst and, according to the complaint, "he almost ran somebody over and then berated the person afterwards." Mr. Arenson investigated and determined that the driver was Mr. Selvaggio. Mr. Arenson reported to Mr. Brill, "Mike was told if it happens again he will receive time off." (E-7). The Grievant received another disciplinary notice for which he suffered a "suspension until further notice" for a $1589.88 shortage. (E-6). Thus, the Grievant had two documented disciplinary incidents and a complaint about him after the Last Chance Agreement. In addition, there were the two incidents with the Grievant taking papers, about which Mr. Arenson testified.

The Arbitrator is persuaded that the Company could have terminated the Grievant when Mr. Arenson caught him with the extra bundle of papers on two different occasions prior to June 16th, but it did not do so. The incident immediately preceding the June 16th situation occurred when Mr. Arenson confronted the Grievant in front of his truck. In that case, there could be no doubt that the papers did not belong on the Grievant's truck, and the papers had left the inside of the building. The Arbitrator finds that the Grievant was unmistakably on notice that the possession of unauthorized papers in violation of his Last Chance Agreement would cause his termination. Nevertheless, the

Grievant repeated that misconduct on June 16th.  The only difference was that he was stopped and sent home before he left the drivers' room with the papers.

There are two remaining matters that need to be addressed.  First, Mr. Brill testified that a route survey was conducted on the Grievant's route[4], and the Company learned that there were 10 to 12 dealers who had a complaint about late deliveries, and an additional 5 to 6 complained that the Grievant takes water from the stores without permission and sometimes without paying for it.  Mr. Brill testified that he would have terminated the Grievant even if the route survey had come back with no complaints, based on the Grievant's conduct on June 16th and the fact that the Grievant was previously warned about taking papers.  Based on Mr. Brill's testimony, the Arbitrator gives no weight to the findings of the route survey, since those findings were not a basis for the termination decision.

Second, it is uncontroverted that the papers in issue were waste, because they were not properly cut.  The Company argued and the Arbitrator finds that the status as a waste paper does not change the Company's policy on taking unauthorized papers.  Even waste is a Company asset which the Company has the

---

[4]    The record reveals that the route survey was triggered by a mailman requesting overtime, so the Company wanted to see why overtime was necessary.  The Arbitrator finds that the route survey was done as a normal business practice and was not a means to harass the Grievant.

right to control.[5]  The Company may choose not to have imperfect papers in the public domain for any purpose -- even as a charitable donation.  In any event, if the Grievant wanted to donate papers to a soup kitchen, he either had to gain permission from the Company to do so, or he had to buy the papers and donate them.  He was not free to take the papers without authorization. Accordingly, the outcome in this matter does not vary whether the papers were waste or perfect product, or whether the Grievant was taking them to a soup kitchen or handing them to his neighbors. Under all of those circumstances, the Grievant took Company property without authorization, and this long-service employee well understood that this was prohibited.

For all of these reasons, the Arbitrator finds that the grievance must be denied and the Grievant's termination upheld.

### AWARD

The grievance is denied.  Michael Selvaggio, Jr. violated the terms of his Last Chance Agreement.  Accordingly, Mr. Selvaggio's termination was justified under his Last Chance Agreement.

March 14, 2008

Bonnie Siber Weinstock
Arbitrator

---

[5]  Mr. Brill explained that even the waste papers had a bar code on them, and if a dealer returned those papers, the Company would have to give the dealer credit.

State of New York ) ss.:
County of Suffolk )

On this 14th day of March, 2008, before me personally
came and appeared BONNIE SIBER WEINSTOCK, to me known and known
to me to be the individual described in and who executed the
foregoing instrument and she acknowledged to me that she executed
the same.

notary public

**GARY ALAN** WEINSTOCK
NOTARY PUBLIC, STATE OF NEW YORK
No. 01WE6098509
QUALIFIED IN SUFFOLK COUNTY
MY COMMISSION EXPIRES 9/13/11

1688404Q

**State of New York - Workers' Compensation Board**

**In regard to Michael Selvaggio Jr, WCB Case #0002 3631**

# NOTICE OF DECISION

*keep for your records*

At the Workers' Compensation hearing held on 06/12/2008 involving the claim of Michael Selvaggio Jr at the HAUPPAUGE hearing location, Judge Jeff D. Lerner made the following decision, findings and directions:

DECISION: Awards are made pursuant to Workers' Compensation Law Section 25(1)(f) without prejudice to apportionment. Synvisc injections authorized without prejudice to 25-a & apportionment. Case is continued.

| | |
|---|---|
| Claimant - Michael Selvaggio Jr | |
| Social Security No. - | Employer - DAILY NEWS |
| WCB Case No. - 0002 3631 | Carrier - Ins Co of State of Penn |
| Date of Accident - 04/09/2000 | Carrier ID No. - W117006 |
| District Office - Hauppauge | Carrier Case No. - 0861227323 |
| | Date of Filing of this Decision - 06/17/2008 |

ATENCION:

Puede llamar a la oficina de la Junta de Compensacion Obrera, en su area correspondiente, cuyo numero de telefono aparece al principio de la pagina y pida informacion acerca de su reclamacion(caso).

Page 1 of 1

EC-23 (4/98)

*EX - B*

STATE OF NEW YORK
WORKERS' COMPENSATION BOARD
PO BOX 5205
BINGHAMTON, NY 13902-5205
www.wcb.state.ny.us
(866) 681-5354

Zachary S. Weiss
Chair

RE: SELVAGGIO, MICHAEL
AUGUST 9, 2002
PAGE 2

## PAST MEDICAL HISTORY

The gentleman's past history was significant for a right knee injury that required surgery in February, 1998. He also had surgery to his shoulder in 1994.

## PHYSICAL EXAMINATION

The examinee is 51 years of age. He is 6 feet tall and weighs 250 pounds. He ambulates with a mild limp, favoring his right knee. He had difficulty squatting and bending because of back and knee pain. He climbed easily on and off the examination table. Surgical scars to both knees were fully healed. The examinee had pain, crepitus, and grinding in the patellofemoral area of the right knee with loss of full flexion, but he had satisfactory extension. There was some slight quadriceps atrophy, but there was no evidence of any ligamentous instability. Range of motion of the left knee was also mildly restricted, especially in flexion. He had no evidence of any ligamentous instability, but he seemed to have recovered his quadriceps mechanism of his left knee. He complained of some subjective tenderness to his low back, but there was no evidence of any spasm. I also found no evidence of any long tract signs to his lower extremities.

## DIAGNOSIS

It is my impression that this gentleman sustained a cervical spine sprain/strain which has resolved and a thoracolumbar spine sprain/strain which has resolved as well as an internal derangement of the left knee which has undergone successful arthroscopic surgery, and a contusion and aggravation of a chronic preexisting right knee condition which has left the examinee with painful residuals; all causally-related to the incident of April 9, 2000.

## CONCLUSIONS

I feel that he has a temporary, moderate, partial disability.

I would apportion 50 percent of the examinee's condition to preexisting conditions and 50 percent to the injury on the above date. It is too early to comment on permanency.

Treatment:  I feel that authorization should be given for a right total knee replacement and performed as soon as possible with a postoperative trial of therapy for about three months prior to further reevaluation. He is capable of performing sedentary-type work only. There is no need for an FCE at this time.

EX-C
EXHIBIT-C

RE: SELVAGGIO, MICHAEL
AUGUST 9, 2002
PAGE 3

If there are any further questions, please feel free to call or write.

Harvey Fishman, M.D.
*Orthopedic Surgeon*

HF/jy    02-00532885 DOC/jp

TESTIMONY AVAILABILITY: 2nd Monday - A.M. Hempstead, 4th Monday - A.M. Suffolk. All other locations – Dr. Fishman prefers and is available for in-house and/or telephone deposition.